STATE OF CONNECTICUT *v.* LARRY RUSCOE
(13447)

SHEA, GLASS, COVELLO, HULL and SANTANIELLO, Js.

Argued March 30—decision released July 25, 1989

*Temmy Ann Pieszak,* assistant public defender, for the appellant (defendant).

*Geoffrey E. Marion,* deputy assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan,* state's attorney, *Warren Murray,* deputy assistant state's attorney, and *Christine Marsching,* legal intern, for the appellee (state).

SHEA, J. The defendant appeals from his convictions for larceny in the second degree; General Statutes § 53a-123 (a) (2);[1] possession of drug paraphernalia; General Statutes § 21a-267 (a);[2] and three counts of selling equipment with defective identification marks. General Statutes § 53-132.[3]

[1] General Statutes § 53a-123 (a) (2) provides: "A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . the value of the property or service exceeds five thousand dollars."

[2] General Statutes § 21a-267 (a) provides: "No person shall use or possess with intent to use drug paraphernalia, as defined in subdivision (20) of section 21a-240, to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain or conceal, or to inject, ingest, inhale or otherwise to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain or conceal, or to inject, ingest, inhale or otherwise introduce into the human body, any controlled substance as defined in subdivision (9) of section 21a-240. Any person who violates any provision of this subsection shall be guilty of a class C misdemeanor."

[3] General Statutes § 53-132 provides: "Any person who, with intent to defraud, knowingly, for himself or for others, buys, sells, receives, disposes of, conceals, uses or attempts to sell or dispose of, or has in his possession for any of said purposes, any electrical motor, apparatus, appliance, device, mechanism, container, cabinet, receptacle, equipment or part on which the

From the evidence at trial, the jury could reasonably have found the following facts. On January 5, 1987, several members of the Norwalk and Wilton police departments arrived at the defendant's house in Norwalk to execute a search warrant for silver candleholders, napkin rings and a mug, which had been stolen during a recent burglary in Wilton. The officers announced their presence and purpose, and, upon receiving no reply, forcibly entered the defendant's house. They found the defendant standing in the living room. The living room was filled with electronic equipment, much of it stacked in piles. The police conducted a sweep of the premises and gathered the defendant and the other occupants of the house into the living room. After the defendant read the warrant, he pointed to two candleholders, four napkin rings, and a candy dish on the dinette table and told the officers that these were the items they were looking for, and therefore, that they were not entitled to search the house any further. The police undertook a thorough search of every room of the defendant's house and of the attached garage. They continued to search for the silver mug listed in the warrant and for additional candleholders and napkin rings. In the defendant's house the police found a large assortment of stacked up stereo equipment, VCRs and televisions; jewelry; a box of car stereo components; and drug paraphernalia. In the defendant's garage, the police found a variety of major appliances, many of which were in their original packing and some of which had their shipping labels still attached. The police also seized a key to the defendant's safe deposit box. On January 7, 1987, the police searched the defendant's safe deposit box pursuant to a second warrant and seized more jewelry and a large amount of cash.

manufacturer's serial number or other distinguishing number, name or identification mark has been removed, defaced, concealed, altered or destroyed, shall be fined not more than one hundred dollars or imprisoned not more than three months or both."

The defendant has raised a constellation of claims challenging every aspect of this case. We decline to address the defendant's claims of error that are related to the January 7, 1987 search of his safe deposit box, because the state introduced sufficient evidence from the search of the defendant's house to sustain the convictions.[4] With respect to the remaining issues, we find error in the sentencing of the defendant on the counts relating to equipment with defective identification marks and no error on the other claims.

## I

The defendant's first claim is that the trial court erred in finding that the January 5, 1987 search warrant was based on sufficient probable cause under the fourth and fourteenth amendments to the United States constitution and article first, § 7, of the Connecticut constitution.

The affidavit in support of the January 5 warrant was based primarily on information from a confidential police informant. This informant had worked with the affiants for four years and had demonstrated his reliability by providing accurate information that had resulted in the arrests of several burglars. The affidavit relates that on January 1, 1987, the informant visited the defendant's house. The defendant asked the informant if he knew anyone who wanted to buy some

---

[4] These claims include the following: that the January 7, 1987 warrant was not based upon sufficient probable cause, because it did not satisfy either prong of the *Aguilar-Spinelli* test; *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); that the affidavit in support of the January 7 warrant consisted of stale information; that a *Franks* hearing was required with respect to the January 7 affidavit; *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); that the January 7 warrant was not sufficiently specific; that the seizure of the safe deposit key was improper; that the police performed an illegal search when they answered approximately fifty incoming telephone calls during the January 5 search; that the safe deposit box was seized before a warrant was issued; and that no good faith exception applied to the two warrants.

"stuff," and told him to look around the basement. In the basement the informant observed numerous appliances, including televisions and stereos, and sterling silver, including "candleholders, napkin holders, and a silver mug." The affidavit also reported that the informant had information that these items were stolen during a burglary in Wilton; that the Wilton police department reported that a burglary had taken place on December 12, 1986, at the Cooper residence in Wilton, and in that burglary sterling silver had been stolen, including a mug, napkin holders and candlesticks; and that a check of the defendant's record revealed "an extensive criminal history, including convictions for Burglary 2nd, Larceny 1st, Theft of a Firearm, forgery, violation of probation, and possession of marijuana."

In *State* v. *Kimbro,* 197 Conn. 219, 233, 496 A.2d 498 (1985), we concluded that article first, § 7, of the Connecticut constitution "affords more substantive protection to citizens than does the fourth amendment to the federal constitution in the determination of probable cause." Accordingly, we held that the determination of probable cause under article first, § 7, is to be examined under the two-prong analysis of the *Aguilar-Spinelli* test, rather than under the less strict "totality of the circumstances" analysis set out in *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983). *State* v. *Kimbro,* supra, 235–36; see *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964).

The *Aguilar-Spinelli* test for reviewing a finding of probable cause consists of two prongs: " 'The issuing [judge] must be informed of (1) some of the underlying circumstances relied on by the person providing the information to the affiant; and (2) some of the underlying circumstances from which the affiant concluded (a) that the informant, whose identity need not even

be disclosed, was credible, or (b) that his information was reliable.' " *State* v. *Delmonaco,* 194 Conn. 331, 338, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984). The defendant claims that the affidavit in this case satisfied neither prong of the *Aguilar-Spinelli* test.

The defendant asserts that the first prong of the test, the "basis of knowledge" prong, was not satisfied because there is nothing in the affidavit to indicate how the informant learned that the silver items were stolen from a house in Wilton. We conclude, however, that consistent with our holding in *State* v. *Delmonaco,* supra, the trial court properly found that the "basis of knowledge" requirement was satisfied.

In *State* v. *Delmonaco,* supra, 340, we recognized that "[e]ven where the *Aguilar-Spinelli* test is applied rigidly . . . there are certain circumstances in which a reliable or credible informant's tip that fails to satisfy the 'basis of knowledge' prong may be credited for the purpose of establishing probable cause." We held, therefore, that " '[w]hen a tip not meeting the *Aguilar* test has generated police investigation and this has developed significant corroboration or other "probative indications of criminal activity along the lines suggested by the informant" . . . the tip, even though not qualifying under *Aguilar,* may be used to give such additional color as is needed to elevate the information acquired by police observation above the floor required for probable cause.' " (Emphasis omitted; citations omitted.) Id., 341, quoting *United States* v. *Canieso,* 470 F.2d 1224, 1231 (2d Cir. 1972).

In the present case, the Norwalk police corroborated the information provided by the informant. Sergeant Bartek of the Wilton police department, when contacted by members of the Norwalk police department, reported that on December 12, 1986, three weeks before the informant had been in the defendant's home,

sterling silver items had been stolen from a residence in Wilton. Those items included "a mug, napkin holders and candlesticks." That information, though later challenged by the defendant as inaccurate, when combined with the tip from the informant, "relate[d] sufficient facts from which a judge reasonably could conclude that the [informant] based [his] allegations of criminal activity on sufficient underlying circumstances." *State* v. *Delmonaco,* supra, 339.

The defendant raises the additional claim that the police had insufficient information to corroborate the informant's allegations. The defendant bases this claim of insufficiency on the difference in sizes between "candlesticks," which he states are tall, and "candleholders," which he maintains are short. We note that the American Heritage Dictionary defines "candlestick" as "[a] holder, often ornamental, with cups or spikes for a candle or candles. Also called 'candleholder.' " Unconstrained by standard lexicographical sources, the defendant apparently would prefer the world of Lewis Carroll: "When I use a word . . . it means just what I choose it to mean—neither more nor less." L. Carroll, Through the Looking-Glass, c. 6. We decline to adopt such a subjective approach to language.

We similarly conclude that the affidavit satisfied the second prong of the *Aguilar-Spinelli* test, known as the "reliability" prong. "An affiant need not recite the precise factors on which he judged his informant credible or reliable. . . . If they are apparent to the common-sense reader of the affidavit—whether by necessary implication or recital—it is enough." *State* v. *Jackson,* 162 Conn. 440, 452–53, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972).

In *State* v. *Just,* 185 Conn. 339, 361, 441 A.2d 98 (1981), we stated that "[o]ne of the most common fac-

tors used to evaluate the reliability of an informant's information is the corroboration of the information by the police. . . . 'The theory of corroboration is that a statement [that] has been shown true in some respects is reasonably likely to be true in the remaining respects.' " See *State* v. *Ross,* 194 Conn. 447, 465–66, 481 A.2d 730 (1984); *State* v. *Daley,* 189 Conn. 717, 721, 458 A.2d 1147 (1983), and cases cited therein. As we indicated earlier, the information provided by the informant was corroborated by a report from the Wilton police department. Further, the informant had proven his reliability by providing information that had led to the arrests of a number of burglars. See *People* v. *Arnold,* 186 Colo. 372, 527 P.2d 806 (1974); 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment (2d Ed. 1987) § 3.3 (b), pp. 629–30. Thus, we find that a common sense reading of the facts in the affidavit also satisfied the "reliability" prong of the *Aguilar-Spinelli* test. See *State* v. *Morrill,* 205 Conn. 560, 568, 534 A.2d 1165 (1987). Further, because the affidavit contains sufficient evidentiary allegations to permit the issuing judge to make a finding of probable cause under the standards of *State* v. *Kimbro,* supra, we need not consider the probable cause determination under the less strict standards of *Gates.*

## II

In a further challenge to the January 5 affidavit, the defendant claims that the trial court erred in denying him an evidentiary hearing pursuant to *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). Specifically, he claims that the affidavit in support of the search warrant for his house contained omissions and misstatements of material facts, entitling him to a further evidentiary hearing as to the truthfulness of the affidavit, and that the trial court erred when it

found that he did not make a sufficient offer of proof pursuant to *Franks*. We agree with the trial court that no *Franks* hearing was required.

In *Franks* v. *Delaware,* supra, 155–56, the United States Supreme Court held that a defendant may challenge the truthfulness of an affidavit supporting a search warrant, provided the defendant has made a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit . . . . " If this statement is necessary to the finding of probable cause, "the Fourth Amendment requires that a hearing be held at the defendant's request." Id. The court stated also that "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and . . . [t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. . . . The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant." Id., 171.

In support of his claim that he was entitled to a *Franks* hearing, the defendant offered the affidavit of an acquaintance. The acquaintance stated that he had viewed the affidavit in support of the search warrant for the defendant's house, that he had given the defendant the silver items named in the warrant as collateral for a ten dollar loan, that he had stolen the silver items from a family with whom he had lived and had been convicted for this theft, that the only items that he had given to the defendant were the candlesticks and the napkin holders, and that at no time did the defendant have any silver mug from this theft.

We find this affidavit insufficient to mandate an evidentiary hearing pursuant to *Franks*. First, and most significantly, the acquaintance's affidavit actually *supports and corroborates* the allegation in the January 5, 1987 affidavit that the defendant was in possession of stolen candlesticks and napkin rings, which in itself would have justified the issuance of a warrant. Second, the acquaintance's affidavit does not indicate that the information in the January 5 affidavit regarding the silver mug was fabricated by the police. Such a showing is required under *Franks. State* v. *Morrill,* supra, 571; see *State* v. *Stepney,* 191 Conn. 233, 239, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). At most, a generous reading of this affidavit suggests that the informant made up this information, a theory amply repudiated by the police investigation confirming its accuracy.

The defendant points out that the acquaintance's affidavit reveals an inaccuracy in the January 5, 1987 affidavit with respect to the residence from which the silver items were taken. Again, there was no offer of proof that these statements were made by the Norwalk police with knowledge of their falsity or with reckless disregard for their truth. Accordingly, the defendant's offer of proof was insufficient to establish his right to an evidentiary hearing pursuant to *Franks. State* v. *Morrill,* supra, 572.

### III

We also reject the defendant's assertion that the evidence seized during the search of his house should have been suppressed because the warrant was not sufficiently particular to comply with constitutional requirements.[5]

---

[5] Although the defendant cites the requirement of article first, § 7, of the Connecticut constitution, that a warrant must describe items to be seized "as nearly as may be," he makes no separate claim under that provision.

The fourth amendment requires that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. In the present case, the warrant described the items to be searched for and seized as: "The property described in the foregoing Affidavit and Application, to wit: Sterling Silver, specifically candlesticks, napkins holders and a silver mug." The defendant claims that this description was too general, because it did not recite, within each category, either the size or the number of the items to be seized. We believe, however, that this description was sufficiently specific to satisfy the demands of the fourth amendment.

" 'A search warrant must describe the objects of the search with reasonable specificity, but need not be elaborately detailed.' . . . Nor must the warrant 'enable authorities "to minutely identify every item for which they are searching." ' . . . 'Thus, a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit.' " (Citations omitted.) *United States* v. *Shoffner,* 826 F.2d 619, 630 (7th Cir. 1987).

There is no indication in the record, despite the defendant's claim to the contrary, that the police had access to information from which a more specific description could have been provided. Further, as we stated in part I of this opinion, we reject the distinction the defendant draws between "candlesticks" and "candleholders" based upon their difference in height. In sum, we conclude that "[t]he warrant described the categories of items to be seized sufficiently to circumscribe the discretion of the officers [who were] executing [it]." *United States* v. *Shoffner,* supra, 631; cf. *United States* v. *Blum,* 753 F.2d 999, 1001 (11th Cir. 1985) (description of " 'porcelain ware, toys, furniture, baby products and miscellaneous merchandise fraudulently obtained from vendors throughout the United

States' " was sufficient); *United States* v. *Davis*, 589 F.2d 904, 906 (5th Cir. 1979) (warrant for "white string" and "brown paper" was sufficient); *State* v. *Walker*, 202 Kan. 475, 479, 449 P.2d 515 (1969) (description of "cooking utensils" was sufficient).

## IV

The defendant next claims that the January 5, 1987 search of his home was illegally executed because the police officers failed to comply with the "knock and announce" rule.

On January 5, 1987, Detectives Ronald Pine and Peter Randall of the Norwalk police department obtained a warrant to search the defendant's house in Norwalk. On that same day, a group of approximately ten police officers and detectives from the Norwalk and Wilton police departments arrived at the defendant's house to execute the warrant. The defendant's house was a one-story, single family, ranch house. The structure consisted also of a finished basement and an attached garage, which was accessible through a door from the interior of the house and from the exterior through the overhead garage door. The main floor of the house included two bedrooms, a living room with a dinette area, a galley kitchen, and a bathroom. Four of the policemen, one of whom was in uniform, proceeded to the front door of the defendant's house. As they approached the front door, they heard a "clicking" sound, which indicated to them that someone had just locked the front door. After hearing the "clicking" sound, Officer Charles Chryzanowski banged on the front door and stated "police with a search warrant." The officers heard no response. After waiting ten to fifteen seconds for a response, the police forced open the front door with a sledgehammer. Upon entering the house, the police again announced "police, we have a search warrant." When they entered the house, they

saw the defendant standing in the living room area. The defendant claims that the police did not wait a reasonable period of time before forcibly entering his house. Our holding in *State* v. *Mariano,* 152 Conn. 85, 203 A.2d 305, cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1964), is dispositive of this claim.

In *State* v. *Mariano,* supra, 94, we stated: "From early colonial times we, in this jurisdiction, have followed the common-law requirement in the execution of search warrants that, in the absence of some special exigency, before an officer may break and enter he 'ought to signify the cause of his coming, and to make request to open the doors.' *Semayne's Case,* 5 Co. Rep. 91, back of 91, 77 Eng. Rep. 194 [1907]; *Read* v. *Case,* 4 Conn. 166 [1822]. . . . The length of time an officer must wait before breaking in after an announcement must be reasonable in the light of the circumstances in the particular case." Significantly, we noted that "[r]ecognized circumstances justifying prompt entry after announcement include *those where the persons within already know of the officer's authority and purpose,* where the officers are justified in the belief that the persons within are in imminent peril of bodily harm or where those within are then engaged in some activity [that] justifies the officers in the belief that an escape or the destruction of evidence is being attempted." (Emphasis added.) Id., 95.

As we previously mentioned, when the four officers approached the defendant's front door, they heard a "clicking" sound, which indicated to them that someone had just locked the front door. A reasonable inference may be drawn that the inhabitants of the house had observed the arrival of the police and were well aware of the officers' authority and purpose. See *United States* v. *James,* 764 F.2d 885, 888 (D.C. Cir. 1985). Under these circumstances, therefore, the trial

court did not err in concluding that the police waited a reasonable period of time before forcibly entering the defendant's home.

## V

The defendant next challenges the seizure of items from his house that were not named in the search warrant. He claims that these items were not seizable under the plain view doctrine, and that items were seized in violation of *Arizona* v. *Hicks,* 480 U.S. 321, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987). We need discuss only those items that are necessary to support the convictions.[6] We agree with the trial court that those items were seizable under the plain view doctrine.[7]

In *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), the United States Supreme Court held that in certain circumstances a warrantless seizure by police of an item that comes within plain view during their lawful search of a private area may be reasonable under the fourth amendment. Two requirements[8] must be met to invoke the

---

[6] The jury could reasonably have found that, with respect to the larceny count, the value of the stolen property exceeded $5000. See General Statutes § 53a-123 (a) (2). Testimony was presented concerning the value of the following items that were seized from the defendant's house and garage: Onkyo audio tape deck ($250); RCA video cassette recorder ($500); Magnavox video cassette recorder ($375); Nakamichi cassette deck ($550); Hotpoint double oven and microwave ($1600); RCA stereo console television ($800); two furnaces ($478, $510); and two evaporating coils ($212, $250).

[7] Because we resolve this issue under the plain view doctrine, we need not address the state's claim that the warrant authorized seizure of "any other items that can readily be identified as stolen property," because the warrant incorporated by reference that phrase from the affidavit.

[8] We note the uncertain status of the "inadvertence" aspect of the plain view doctrine. This "requirement" of the plain view doctrine has never been accepted by a judgment supported by a majority of the United States Supreme Court. See *Arizona* v. *Hicks,* 480 U.S. 321, 330, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987) (White, J., concurring); *Texas* v. *Brown,* 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983) (plurality); *Washington* v. *Chrisman,* 455 U.S. 1, 6–7, 102 S. Ct. 812, 70 L. Ed. 2d 778 (1982) (omit-

plain view doctrine: (1) the initial intrusion that enabled the police to view the items seized must have been lawful; and (2) the police must have had probable cause to believe that these items were contraband or stolen goods. *Arizona* v. *Hicks,* supra; *State* v. *Hobson,* 8 Conn. App. 13, 18, 511 A.2d 348, cert. denied, 201 Conn. 808, 515 A.2d 379 (1986); cf. *State* v. *Reddick,* 207 Conn. 323, 335, 541 A.2d 1209 (1988).

It is clear that the police were lawfully present in the defendant's house and garage when they saw the items that they seized. The determinative question, therefore, is whether there was probable cause to believe that the seized items were contraband or stolen items.

During the search of the defendant's house, Officer Chryzanowski saw an Ohaus scale and dish on the kitchen counter, and on the scale dish, he saw a white residue. Chryzanowski testified that, according to his experience as a narcotics officer, scales such as the one on the defendant's kitchen counter are customarily used by narcotic sellers for weighing narcotics. We agree with the trial court that from this information, Chryzanowski had probable cause to believe that the scale and dish were instruments of a crime, and therefore, the seizure was proper.

In connection with the larceny count and the three counts relating to defective identification marks, the state also introduced into evidence a large number of

ted as a separate requirement); *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) ("inadvertence" requirement endorsed by four justices; rejected as unsound by four other justices).

In any event, this court has held that "inadvertence is not required if the items seized fall under the category of contraband, stolen property or objects dangerous in themselves." *State* v. *Couture,* 194 Conn. 530, 547, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); accord *United States* v. *Liberti,* 616 F.2d 34, 38 (2d Cir. 1980) (Newman, J., concurring); cf. *State* v. *Reddick,* 207 Conn. 323, 335, 541 A.2d 1209 (1988).

items that had been seized from the defendant's house and garage. Because the warrant was for other stolen property it did not provide a sufficient basis for probable cause to seize these objects. Some additional showing was required with respect to the items seized that were not specified in the warrant, such as evidence that the serial numbers on them had been removed, knowledge by the executing officers that articles of that specific type had been stolen recently in the area, or indications that the quantity and placement of the articles were such that they obviously were not on the scene for ordinary use. 2 W. LaFave, supra, § 4.11 (b), p. 342; see *Klenke* v. *State,* 581 P.2d 1119 (Alaska 1978) (officer literally surrounded by articles of general type taken in recent burglaries, and many articles had serial numbers removed); *State* v. *Carr,* 361 N.W.2d 397 (Minn. 1985) (warrant specified only stolen phone equipment; proper to seize many TVs, stereos, etc., in light of "quantity and placement of the articles").

There was clearly probable cause to believe the seized items were stolen. Upon entering the defendant's house, the police were confronted with a large assortment of stacked up televisions, stereo components, and cable boxes. Detective Pine described the defendant's living room as resembling a "Crazy Eddie's" store. On the dinette table in the defendant's living room, the police found two candlesticks and four napkin rings. Pine testified that after this discovery, the officers conducted a thorough examination of every room in the house and of the garage in order to locate the silver mug and additional candlesticks and napkin rings. He stated that in his experience, napkin rings and other silver items customarily are purchased in sets of eight or more. The police moved the large equipment to look behind and inside these items for the silver pieces listed in the warrant that had not yet been found.

While looking behind the stereo equipment in the living room for the silver listed in the warrant, Detective Pine noticed that many of the items had no serial numbers. Of these items, Pine recognized the brand name of an Onkyo tape deck from the report of a recent burglary. While moving an RCA television in the living room to locate the items listed in the warrant, Pine similarly noticed the absence of serial numbers. In one of the bedrooms, Pine found two unconnected VCRs on the bed, which fit descriptions from recent burglaries. While moving the VCRs to look for silver items, Pine noticed that their serial numbers were missing. The police continued the search in the defendant's garage, the windows of which were covered by paper. The garage was filled with brand new major appliances, many of which were still in their original packing, and many of which also contained shipping labels and other markings indicating that they did not belong to the defendant. The police were aware of recent burglaries from condominium construction sites. During the search in the garage, the police found a Nakamichi tape deck without a serial number. Pine was aware that a Nakamichi tape deck, a brand name that stuck out in his mind, had been stolen two days earlier. In addition to the Nakamichi tape deck the police seized a large quantity of stacked up items from the garage, including the following: two furnaces with shipping labels still attached; a Hotpoint double oven and microwave; and two air conditioner evaporating coils, in their boxes with shipping labels attached.

This set of circumstances, combined with the prior knowledge by the police of the defendant's convictions for larceny, theft, forgery, and burglary, amply justified the seizure of the items not named in the warrant.

We disagree also with the defendant's claim that moving the appliances and electronic equipment constituted a violation of *Arizona* v. *Hicks,* supra. In *Ari-*

zona v. *Hicks,* during the course of a search for weapons, one of the policemen noticed two sets of stereo components that he suspected were stolen. The officer moved some of the components to read and record the serial numbers, and thereafter seized one of the turntables. The court held that the seizure was improper, because the officer's moving of the equipment was "unrelated to the objectives of the authorized intrusion." Id., 325.

The present case is quite different. As we noted earlier, the police moved items in the course of searching for items listed in the warrant, and in so doing, noticed the absence of serial numbers on several items. It is quite clear that this viewing was in the course of a lawful search. Further, the police were not required to avert their eyes, nor were they required to reject their common sense conclusions, drawn from the absence of serial numbers in the area where they ordinarily are located on the backs of the assorted VCRs, tape decks and televisions. The defendant's further assertion that "it was simply not reasonable for Pine to have believed that the silver items might be located in a hollowed out appliance" is nothing more than a factual issue that was implicitly resolved against the defendant at the suppression hearing.

The defendant claims also that the January 5 search warrant was a subterfuge to gain entry into his house to search for and seize other evidence not specified in the warrant. This claim, which is developed entirely in lengthy footnotes in the defendant's brief,[9] has two

---

[9] We are puzzled by defense counsel's continued use of lengthy footnotes to brief issues, despite having been specifically reminded by the Appellate Court of the impropriety of this practice. See *State* v. *Webley,* 17 Conn. App. 200, 202 n.2, 551 A.2d 428 (1988); *State* v. *Reddick,* 15 Conn. App. 342, 343, 545 A.2d 1109 (1988). We do not approve of tactics that are designed to circumvent our rules of practice. See Practice Book §§ 4065, 4071.

main components. First, the defendant maintains that the participation in the execution of the warrant by Officer Chryzanowski, a narcotics officer, demonstrates that the police actually intended to conduct a drug search. Second, he maintains that the prior intent to seize appliances is evident because the police "knew in advance" that assorted electronic equipment and appliances were in the defendant's house.

Our review of this claim is limited by the defendant's failure to present this claim of subterfuge to the trial court at the suppression hearing. In *State* v. *Johnson,* 162 Conn. 215, 226, 292 A.2d 903 (1972), in which we upheld the conclusion of the trial court that the search was not a subterfuge, we stated: "The question of the credibility of the witnesses was for the trial court to determine."

In any event, the record does not support the defendant's claim. With the exception of certain drug-related items, which were suppressed by the trial court, "[t]he search was consistent with a thorough investigation and was not a subterfuge directed toward uncovering evidence of another crime; it was conducted without unnecessary severity and intensity in the course of a search under lawful authority; and it was not unreasonable under all the circumstances involved." Id.; see *United States* v. *Johnson,* 707 F.2d 317, 320–21 (8th Cir. 1983) (mere fact that policemen with other responsibilities participated in execution of warrant does not establish subterfuge); *State* v. *Pepe,* 176 Conn. 75, 79–80, 405 A.2d 51 (1978) (discovery of items need not catch police completely by surprise).

## VI

We next consider the defendant's claim that the state introduced evidence of the defendant's responses to custodial interrogation in violation of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694

(1966). This claim concerns evidence of two interactions between the defendant and the police, one following the defendant's reading of the warrant after he had asked the officers what they were looking for, and the other when the defendant was asked if he had receipts for any of the items found in his house. The defendant claims that this evidence ought not to have been admitted because the record does not demonstrate that adequate warnings under *Miranda* were given and that, even if they were, the defendant did not knowingly and intelligently waive his rights. We decline to review fully the admissibility of this evidence.

Initially, we note that the defendant failed to raise this claim at trial either by way of an objection or by a motion to suppress. While we do not ordinarily review claims not raised below, we have recognized an exception "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973); see *State* v. *Plourde,* 208 Conn. 455, 462, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034 , 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989). Accordingly, we must consider the record to determine whether it is adequate for the purpose of our review.

The defendant challenges first the admissibility of Detective Randall's testimony that the defendant identified certain items on the dinette table as those sought in the warrant, and thereafter, stated that the police were not entitled to search the rest of the house. He challenges also Randall's testimony that the defendant was asked if he had any receipts for the items in the living room and that the defendant was able to produce only two receipts. The prosecutor also made brief reference to these two incidents in his closing argument, while pointing out that other people had produced receipts for some of those items. With respect to

*Miranda* warnings, Detective Pine testified that he "advise[d] the defendant of his rights," and "advise[d] him of the right to remain silent." The record does not indicate at what point during the raid these warnings were given, nor does it reveal the other circumstances surrounding the two challenged interactions.

We deem this record insufficient to review the defendant's claim. Our conclusion is primarily based on the lack of clarity in the record as to whether the defendant was actually subjected to custodial interrogation. As this court has held, *Miranda* warnings are necessary only if the defendant was, in fact, subjected to custodial interrogation, and the defendant had the initial burden of proving custodial interrogation. *State* v. *Pittman,* 209 Conn. 596, 605–606, 553 A.2d 155 (1989). Because the defendant failed to raise this claim at trial either by way of an objection or by a motion to suppress, the trial court was never afforded an opportunity to determine as a factual matter whether the defendant was subjected to custodial interrogation. Id., 606. Further, the record is unclear as to the nature and extent, as well as the timing, of the *Miranda* warnings that the police gave to the defendant, and whether the defendant waived those rights. Accordingly, because the record does not demonstrate a clear violation of the defendant's rights, we decline to review this claim further. *State* v. *Plourde,* supra, 463.

In any event, the admission of this testimony was harmless beyond a reasonable doubt. The evidence relating to the two challenged incidents was not highlighted in the state's case, and the evidence of the defendant's guilt was overwhelming. See *State* v. *Hull,* 210 Conn. 481, 493, 556 A.2d 154 (1989).

VII

The defendant next claims that the evidence against him was insufficient to support the jury's verdicts. He

claims that the evidence was insufficient to prove beyond a reasonable doubt: (1) that he possessed either the items found in the house or in the garage; (2) that he possessed items with defective identification marks with the intent to defraud; (3) that he possessed items with defective identification marks for a purpose proscribed by § 53-132; and (4) that he possessed items for one of the proscribed purposes under the drug paraphernalia charge. We find no error.

In reviewing a claim of insufficiency of the evidence, this court construes the evidence in the light most favorable to sustaining the jury's verdict and will affirm that verdict if it is reasonably supported by the evidence and the logical inferences drawn therefrom. *State* v. *John,* 210 Conn. 652, 660, 557 A.2d 93 (1989). The issue is whether the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. Id.

The state presented evidence that the defendant leased the entire house in Norwalk and that he was the only lessee. The house was small and the garage was connected to the house and accessible from the interior of the house. The landlord testified that he had placed a lock on the door to the garage from the interior of the house, that he used a number of locks at his houses, all of which took the same key, and that he had given the defendant a key to a lock that had been used in a house that he had previously leased to the defendant. The landlord further stated that the items in the garage did not belong to him. After informing the police that the items named in the warrant were on the dinette table, the defendant instructed the police not to search the rest of the house. The Ohaus scale, with cocaine residue on the scale dish, was located on the kitchen counter, and the police also seized a marijuana roach that was in plain view on the dinette table. The defendant's house and garage were filled with large quanti-

ties of appliances, many of which were openly displayed, including, in the living room and bedroom, numerous VCRs, televisions, and tape decks. In the garage, the windows of which were covered with paper, the police discovered various major appliances that, from their markings, obviously did not belong to the defendant. Many of the appliances and electronic items were missing their serial numbers and were identified by their owners at trial as having been stolen in recent burglaries. Many of these appliances and electronic items were stacked on top of one another, were in their original packaging and were not connected to an outlet.

After a careful review of the record, we cannot say that the jury could not reasonably have concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify their verdict of guilty beyond a reasonable doubt.

## VIII

The defendant asserts that the trial court deprived him of his confrontation rights by refusing to allow him to cross-examine a witness, Joseph Isaac, with questions that pertained to his veracity.

In *State* v. *Martin,* 201 Conn. 74, 513 A.2d 116 (1986), we drew a distinction between impeaching a witness on the basis of his prior convictions and impeaching him on the basis of specific acts of misconduct that indicate a lack of veracity, without mentioning the convictions. We noted that " '[t]he two methods of cross-examination are wholly dissimilar.' " Id., 86, quoting *Heating Acceptance Corporation* v. *Patterson,* 152 Conn. 467, 472, 208 A.2d 341 (1965).

The defendant claims that his attempt to impeach the credibility of Isaac was not based upon his convictions for larceny in the fifth degree and failure to appear in

the second degree, but rather, on the underlying acts of misconduct that indicated a lack of veracity. This claim is wholly without merit and is a serious distortion of the events at trial. The record plainly demonstrates that defense counsel wished to ask Isaac about his "individual convictions," and that the attempt to impeach credibility was not based on specific acts of misconduct, but on misdemeanor convictions. The trial court properly excluded this evidence. See *State* v. *Martin,* supra, 86 n.8.

The defendant challenges also the court's instruction on the jury's consideration of Isaac's burglary conviction. The court instructed the jurors that they were "not to use [the prior conviction] to discredit all his testimony merely on that fact alone." The defendant claims that the jurors were entitled to discredit all of Isaac's testimony on the burglary conviction alone if they so chose. This claim, however, was not raised below. Accordingly, because the jury instructions, read as a whole, adequately conveyed to the jurors that they were the sole judges of credibility, we decline to review this claim further.

## IX

At the conclusion of closing arguments, the defendant moved for a mistrial because of alleged prosecutorial misconduct. The defendant claimed that the prosecutor's remarks during summation were improper in several respects: (1) implying that the defendant himself had committed the burglaries by referring to the burglaries and the professionalism with which they were committed; (2) referring to the fact that the defendant had produced only two receipts for items in his house; (3) referring to the attack on a state's witness before the trial had commenced; and (4) referring to his defense as a "smokescreen."

This issue comes to us on appeal as a hodgepodge claim of eighteen varieties of misconduct, over fifty instances in all,[10] most of which are contained in an enormous footnote in the defendant's brief. We will address fully only the first and second claims of misconduct, because those claims were raised at trial and are adequately preserved for review. The defendant has not briefed the third claim of misconduct that was raised at trial, and, with respect to the fourth claim, he has not explained on appeal either why the remark was improper or how he was prejudiced by it. With respect to the defendant's remaining claims, we have reviewed the record and find these claims to be without merit. Because none rise to the level of a violation of the defendant's constitutional right to a fair trial, no further review of these claims is warranted. See *State* v. *James,* 211 Conn. 555, 590, 560 A.2d 426 (1989).

During his closing argument, the prosecutor referred several times to the various burglaries from which items had been taken and to the professionalism with which those burglaries were committed. At one point, in noting that one of the burglaries had occurred on January 3, 1987, and that items from that burglary were in the defendant's house on January 5, 1987, the prosecutor remarked: "Somebody had a busy day. I wonder who." The defendant claims that these remarks implied that the defendant himself had committed the burglaries, even though he was not so charged.

At the outset, we note that the trial court did not interpret the prosecutor's remarks in the same manner as the defendant. The court, as a result of its familiarity with the context in which the prosecutor's remarks were made, was in a favorable position to

---

[10] We note that the prosecutor's closing argument and rebuttal amount to twenty-five pages of transcript.

evaluate the nature of these remarks. *State* v. *Ubaldi,* 190 Conn. 559, 563, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). Therefore, its determination that the prosecutor's remarks did not require a mistrial must be afforded great weight. Id.

We agree with the trial court that the references to burglaries were unavoidable, given the nature of the evidence that was presented in this case. In any event, the court made it clear in its jury instructions that the defendant was not being tried on burglary charges. Further, in *State* v. *Palkimas,* 153 Conn. 555, 559, 219 A.2d 220 (1966), we stated that "the circumstantial evidence of possession of recently stolen property raises a permissible inference of criminal connection with the property, and if no explanation is forthcoming, the inference of criminal connection may be as a principal in the theft, or as a receiver under the receiving statute, depending upon the other facts and circumstances [that] may be proven." Under these circumstances, therefore, because the state had the burden of proving that the defendant knew the property was stolen, the prosecutor could properly suggest that the defendant had been busy on January 3, 1987, receiving stolen property and that he was aware of the circumstances under which the items were taken.

In another part of his closing argument, the prosecutor referred to the fact that the defendant was unable to produce receipts for many of the items in his house: "Who has this many VCRs? These channel changers and these control things that were affixed to some of the items. There are no receipts for these items. I take that back. We have seen some receipts for some of these items. But do you know who we've seen them from? We've seen them from the State's witnesses. That's whom we've seen receipts for these items from. These items belong to other people. They have other

people's names on them. They're in new boxes. Redding Oil Company. This box I believe says, 'Sold to Brown.' This says, 'Redding Oil Company,' on it.''

We disagree with the defendant's assertion that the prosecutor's remarks were a comment on the defendant's failure to testify. As the court recognized in denying the defendant's motion for a mistrial, it was necessary for the state to prove that the items in question were stolen. In the context of the entire argument, therefore, it was permissible for the prosecutor to remark that the state had shown not only that the items were stolen, but also that the defendant was aware of the stolen nature of those items from their outward appearance. Cf. *State* v. *Oliveras,* 210 Conn. 751, 762–63, 557 A.2d 534 (1989).

X

The defendant claims several errors in the instructions to the jury. We find no error so significant as to warrant a new trial.

A

The defendant claims that the trial court improperly defined the elements of § 53-132, regarding equipment with defective identification marks. He asserts that under one alternative method of committing the offense, § 53-132 requires proof that the items with defective identification marks were possessed for one of the proscribed purposes set forth in that statute, and that the court never adequately explained this requirement to the jury.

In reviewing this type of challenge to a jury charge, the court looks to the charge as a whole to determine whether it gave the jury a clear understanding of the elements of the crime charged and the proper guidance to determine if those elements were present. The trial

court's instructions on the offense charged must include every element of that offense. *State* v. *Cobb,* 199 Conn. 322, 326, 507 A.2d 457 (1986).

In charging upon the elements of the three counts under § 53-132, the court first read the portion of the information that tracked the language of § 53-132. After noting that § 53-132 "basically contains the same wording that is contained in the substituted information," the court explained what the state needed to have proved under that statute: "One of the first elements of this charge is that he intended to defraud, and with that intent, knowingly, for himself or others, had in his possession electrical type devices on which the manufacturer's serial number or other distinguishing number, name or identification mark, had been removed . . . . *The statute itself is in many alternatives of buying, selling, receiving, disposing of . . . or having in his possession for any of those purposes.* So, I don't want you to be misled by the caption of the thing. It is not necessary to prove a sale. As long as he [had] possession of it with intent to defraud, he knew that the nature of the items were in fact items that had the serial or identification numbers removed, defaced or altered in some way. So, the elements of this crime was [sic] an attempt to defraud, knowingly having them in his possession, knowing the character of the items, that they were electrical apparatus types, such as appliances and devices with electrical mechanisms." (Emphasis added.)

The defendant maintains that the purpose for which the items were possessed was a mental element of the offense, but that the jury was told the mental elements were only intent to defraud and knowing possession.

We cannot ignore the fact that the defendant saw no reason to take exception to an instruction that he now claims was improper. "If defense counsel did not

approve of this portion of the charge, then he should have . . . suggested whatever curative language he deemed most appropriate. State v. *Jones,* 193 Conn. 70, 88, 475 A.2d 1087 (1984). An exception at this point . . . would have served the important function of alerting the trial court to what defense counsel believed was erroneous while there was time to correct it without ordering a retrial. [Id.]" *State* v. *Cobb,* supra, 329. The defendant's failure to except is an indication that he accepted the charge on the elements of § 53-132 as correct. Nonetheless, the charge provided the jury with the essential elements of § 53-132. As noted earlier, the court instructed the jury that "[t]he statute itself is in many alternatives of buying, selling, receiving, disposing of, concealing, using, or attempting to sell and dispose of, or having in his possession for any of those purposes." We view the court's further instructions as an explanation of what constituted possession within the meaning of the statute. The court's failure, in those instructions, to explain again the purposeful nature of the possession did not render the instructions misleading. Consequently, while the charge could have been improved upon, we conclude that the essential elements of the offense were adequately presented to the jury and that the defendant therefore cannot prevail on this claim of error.

## B

In instructing on the elements of the drug paraphernalia charge under § 21a-267 (a), the court referred to portions of the statutory definition of drug paraphernalia; General Statutes § 21a-240 (20) (A); to give illustrations of the types of items that may be considered as being drug paraphernalia. This definition included uses for items, to determine if they were drug paraphernalia, that were not included in the information. The court further explained that "possess with intent to use" under § 21a-267 (a) requires proof that the

paraphernalia is possessed with "an intent to use it for purposes prohibited by the drug statutes." The defendant claims that the trial court unconstitutionally enlarged the offense with which he was charged, because the information itself specified the uses for which the paraphernalia was possessed. He maintains that the court's instruction, in referring to uses for paraphernalia found in the drug paraphernalia definition, rather than only those uses alleged in the information, effectively permitted the jury to convict him on the basis of an- uncharged theory of liability.

The defendant concedes that he did not take exception to this charge. He contends that this claim is nevertheless reviewable under the second exceptional circumstance of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). We find no constitutional violation.

" 'The sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution guarantee a criminal defendant the right to be informed of the nature of the charge against him "with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and . . . to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense . . . . " ' " *State* v. *Scognamiglio,* 202 Conn. 18, 22, 519 A.2d 607 (1987). "Therefore, for the defendant to establish an infringement of these constitutional rights, he must demonstrate that the court's charge caused him unfair surprise or prejudiced the preparation of his defense." *State* v. *Franko,* 199 Conn. 481, 490, 508 A.2d 22 (1986). We conclude that the record does not support the defendant's claim that he was unfairly surprised by the disputed instruction or that this instruction prejudiced his defense in any way.

We agree with the defendant that the challenged instruction was very broad. In the present case, how-

ever, the court was not suggesting that a guilty verdict was possible under the uses for paraphernalia that were borrowed from the statutory definition of drug paraphernalia. Indeed, the court narrowed this broad charge by relating it to the specific evidence in this case, namely the Ohaus scale dish and the cocaine residue that was found upon it. Further, there is nothing in the record to indicate that the defendant would have altered his defense in any way if the proscribed uses from the statutory definition of drug paraphernalia that were mentioned had been included in the information. The record reveals that the only theory upon which the state prosecuted this charge was that the defendant possessed a scale dish that had cocaine residue on it. The heart of his defense was that he did not possess either the drug scale or, in fact, any of the items found in his house. Under these circumstances, it is highly unlikely that the jurors were misled by the charge. We are unable to discern, therefore, any way in which the defendant was prejudiced by the court's instructions on the element of intent required under the drug paraphernalia charge. We conclude also that the defendant's failure to except to this instruction undercuts his claim that he was unfairly surprised by it. See *State* v. *Franko,* supra, 490–91.

C

The remaining claims of error in the charge do not warrant extensive review.

The defendant now complains of the court's instruction on constructive possession as it relates to the paraphernalia charge. The defendant maintains that the trial court failed to inform the jury that constructive possession requires proof that the defendant had knowledge not only of the paraphernalia's presence but also of its character. This court has noted that "we do not require technical perfection in jury instructions."

*State* v. *Vessichio,* 197 Conn. 644, 650, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986). In its charge, the court told the jurors that they were to determine whether the defendant had the intent to use the paraphernalia for purposes prohibited by the drug statutes. Such an intent obviously involves knowing of the item's character. Viewing the charge as a whole, therefore, we do not believe that the jury could have been misled by the court's failure to use the word "character" in describing the elements of the drug paraphernalia offense. See id., 651.

The defendant also complains that, with respect to two of the offenses, the court erroneously charged the jury on unsupported theories of liability. In charging on the elements of larceny, the court explained that the state must prove that "the defendant wrongfully obtained or withheld property from an owner." The defendant asserts that there was no evidence to support the " 'withheld' alternative." In the context of this case, however, we conclude that "obtaining" is not analytically distinct from "withholding." See *State* v. *John,* 210 Conn. 652, 689, 557 A.2d 93 (1989); *State* v. *Pelletier,* 209 Conn. 564, 576, 552 A.2d 805 (1989). With respect to the paraphernalia charge, the court gave a lengthy listing of the types of items that may be considered paraphernalia, as well as the uses to which they could be put. The court then related its charge to the specific evidence in the case. The defendant maintains that the instructions were erroneous, because there was no evidence that the scale could be used, for example, to compound, convert, process, ingest or otherwise introduce cocaine into the human body. We conclude that these assorted uses were not intended to describe alternative methods of committing the offense. Rather, § 21a-267 broadly proscribes a number of conceptually

related acts, each of which can be a segment of the process of ultimately ingesting narcotics. Thus, we find no error in those instructions.

## XI

The defendant's final claim, raised for the first time on appeal, is that his conviction on three counts under § 53-132, relating to items with defective identification marks, violates the constitutional guarantee against double jeopardy.

At the outset, we note that review of this claim under *State* v. *Evans,* supra, is appropriate, because, unlike the situation presented in *State* v. *Price,* 208 Conn. 387, 544 A.2d 184 (1988), and *State* v. *Jones,* 166 Conn. 620, 353 A.2d 764 (1974), this case involves a claim of double jeopardy based on multiple punishments for convictions obtained at a single trial. *State* v. *Snook,* 210 Conn. 244, 263, 555 A.2d 390 (1989); *State* v. *Devino,* 195 Conn. 70, 73–74, 485 A.2d 1302 (1985).[11]

The defendant contends that under this court's holding in *State* v. *Rawls,* 198 Conn. 111, 502 A.2d 374 (1985), he cannot be punished for multiple violations of § 53-132 based on the simultaneous possession of more than one piece of electronic equipment with defective identification marks. We agree with the defendant that *State* v. *Rawls,* supra, is indistinguishable from the present case, and therefore, that only a single punishment on the three counts was permissible.

---

[11] In *State* v. *Anderson,* 212 Conn. 31, 35, 561 A.2d 897 (1989), we recently concluded that a similar claim was not reviewable under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). In *Anderson,* the defendant claimed that his prosecution on two counts of kidnapping and on one count each of sexual assault and attempted sexual assault constituted multiple punishments for the same offense in a single trial. The defendant had been acquitted on one count of kidnapping and on the sexual assault count. We concluded that *Evans* review was not warranted, because it was clear that multiple punishments for the same offense had not been imposed, since sentences had been imposed on only one count of kidnapping and on the attempted sexual assault count.

In *Rawls*, the defendant was charged and convicted under General Statutes § 19-481 (a), now General Statutes § 21a-279, which imposed liability on "[a]ny person who possesses or has under his control any quantity of any narcotic substance . . . . " The defendant argued that the convictions of two counts of possession of narcotics for the simultaneous possession of heroin and cocaine punished him twice for the same offense and thereby violated the double jeopardy provision of the United States constitution. We stated that "[t]he proper double jeopardy inquiry when a defendant is convicted of multiple violations of the *same* statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute." Id., 121. We noted that the statute at issue in that case was ambiguous with respect to whether separate punishments were intended for the possession of more than one kind of narcotic substance. Accordingly, we held that "[u]nless a clear intention to fix separate penalties for each narcotic substance involved is expressed, the issue should be resolved in favor of lenity and against turning a single transaction into multiple offenses." Id., 122.

In the present case, the language of § 53-132 does not indicate an intention to authorize multiple punishments for the simultaneous possession of more than one item. Indeed, as the defendant points out, the statute itself proscribes the possession of certain "equipment," a term that can be singular or plural. Furthermore, the evidence does not indicate that the defendant acquired the three items on which the serial numbers had been defaced in separate transactions and the jury might well have concluded that only "possession" of them had been proved. Accordingly, because § 53-132 is ambiguous in respect to whether separate punishments were intended for the possession of more than one item with defective identification marks, the

rule of lenity dictates that the issue be resolved in the defendant's favor, and that two of the defendant's convictions under § 53-132 must be vacated.

There is error only in the judgment on the defective identification mark counts, the judgment on those counts is set aside and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.